## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KIMBERLY JOHNSON,

       Plaintiff,

v.

EMORY HEALTHCARE, INC.,

       Defendant.

Civil Action No.:

1:24-cv-03988-VMC-CMS

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kimberly Johnson, respectfully submits her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. For the reasons set forth below, the motion should be denied because genuine disputes of material fact exist regarding Plaintiff's claims retaliation pursuant to the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C §1981 ("Section 1981").

## I.    Introduction

Plaintiff is an African American female and a licensed registered nurse since December 2011. (Doc. 24 at 20:20–21). She worked as a travel nurse through AMN Healthcare ("AMN") on multiple temporary contracts with Defendant. Plaintiff first contracted with AMN in or around February 2021 (*Id.* at 29:3) and thereafter

completed multiple assignments with Defendant, including on nephrology and surgical units (*Id.* at 39:1–3). She consistently performed well, quickly adapting to new unit requirements and duties (*Id.* at 121:3–6).

### A. Prior Complaints of Discrimination and Retaliation

On September 13, 2022, during an assignment at Emory University Hospital Midtown, Plaintiff raised complaints of racial discrimination and disparate treatment to her then-manager at Defendant, Katherine Lake ("Ms. Lake"). (*Id.* at 57:20-21; 58:20-21; 131:9-11). Plaintiff reported that when she raised patient safety concerns, she was dismissed as "difficult," while white nurses raising identical concerns were praised as "advocates". (*Id.* at 58:5–17). Within hours of making a formal racial discrimination complaint, her contract on that unit was terminated. (*Id.* at 58:20-21; 78:11–12; Defendant's Response to Production of Documents "RPD" "Exhibit 5" at p. D000069).

### B. December 2022 – January 2023 Contract

On December 13, 2022, AMN offered Plaintiff a three-month contract for an assignment at Emory's Unit 62, a nephrology unit, scheduled to begin January 23, 2023, and run through April 22, 2023. (Doc. 1 ¶ 10). The contract terms, as relayed to Plaintiff, did not state that she would be required to perform peritoneal dialysis ("PD") — a specialized and high-risk procedure requiring substantial training.

### C. January 19–20, 2023 – New Requirement Announced

2

Sometime in January, 2023, before her start date, Assistant Nurse Manager Morgan T. Buckovich ("Ms. Buckovich") and AMN representative Lauren Jones ("Ms. Jones") informed Plaintiff that she would be expected to perform PD. (Doc. 1 ¶ 11). Plaintiff had never performed PD in her prior Emory assignments and was not aware travelers were now being required to do so. (Doc. 24 at 42:1–2).

Plaintiff immediately informed Ms. Buckovich and Ms. Jones that she lacked PD experience. In a phone call with Ms. Buckovich on January 19, 2023 (Doc. 25 at 7:16–19), Plaintiff stated that performing PD without adequate preparation posed serious patient safety risks, especially given that Unit 62 served mostly African American patients — a population already disproportionately subjected to poorer healthcare outcomes. (Plaintiff's Declaration, "Exhibit 4" at ¶7). She told Ms. Buckovich that requiring her to perform PD without proper training was akin to treating these patients "as guinea pigs," and stated her belief that she was being placed in this unsafe position because she was an African American nurse, while white nurses were not held to the same high standard. (Exhibit 4 at ¶10).

**D. Training Offer and Plaintiff's Response**

During the January 19, 2023 phone call, Ms. Buckovich told Plaintiff she would receive one 12-hour orientation shift, with four hours devoted to PD training, and the remaining PD training at a future date. (Doc. 25 at 8:4–14). Plaintiff objected, stating this was insufficient under evidence-based standards, which

recommend 15 hours to six weeks of PD training for inexperienced nurses. (Doc. 24 at 109:19–25). She requested twelve hours of PD training before being assigned to the procedure. (*Id.* at 110:1–12).

After assurances from Ms. Buckovich, Plaintiff agreed to proceed with the assignment and training, with the understanding she could seek guidance from Ms. Buckovich and raise concerns if she felt unable to safely perform PD after the training. (Doc. 25 at 9:2-5; 12:16–18; Doc. 24 at 121:16–20, 122:6–8). On January 20, 2023, Ms. Buckovich confirmed by email that Plaintiff would receive the single 12-hour orientation day including four hours of PD training, scheduled for January 25, 2023, and then begin working. (RPD, Exhibit 6, at p. D000104).

### E. Termination Decision

On January 23, 2023, the day before her scheduled orientation shift, Ms. Jones informed Plaintiff that Defendant had decided to end her contract because of "issues providing peritoneal dialysis." (Doc. 1 ¶ 19). Plaintiff reminded Ms. Jones that she had agreed to attend training and had not refused PD duties, only requested adequate preparation to ensure patient safety. (Doc. 25 at 14:12–14; Doc. 24 at 9:2-5; 121:16-20; 122:6–8).

## II.   **Summary Judgement Standard**

Summary judgement is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Put simply, the movant must establish that "everything in the record…demonstrates that no genuine issue of material fact exist." *Tippens v. Celotex Corp.* 805 F.2d 949 952 (11th Cir. 1986). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

"[E]valuating witness credibility and weigh of evidence" are "the ageless role of the jury." *Allison v. McGhan Med. Corp.* 184 F.3d 1300, 1321 (11th Cir. 1999). Likewise, the Supreme Court has established: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255; see also *Miller v. Harget*, 458 F. 3d 1251, 1256 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by one side is doubtful of veracity, it is not proper to grant summary judgment on the basis of credibility choices.").

Accordingly, when a court rules on a motion for summary judgment, "the evidence of the nonmovant is to believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. The Court "may not weigh conflicting evidence to make credibility determinations" and if there are "disputed issues of fact, the court may not decide the motion; rather [the Court] must deny the

motion and proceed to trial." *Ms. Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

## III.    <u>Argument</u>

### 1.    <u>A Prima Facie Case of Retaliation Exists</u>

Title VII prohibits an employer from retaliating against employees that have (1) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing into any discriminatory employment practice (generally referred as the "Participation" Clause); or (2) opposed a discriminatory employment practice (generally referred to as the "Opposition" Clause). *See* 42 U.S.C.§2000e-3(a) (Title VII). Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims. *Gogel v. Kia Motors Mfg. of Ga., 967 F.3d 1121, 1134* (11th Cir. 2020); see also *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452-57, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008).

A Title VII retaliation claim based on circumstantial evidence is ordinarily analyzed under the *McDonnell Douglas* burden-shifting framework. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804, (1973)). Pursuant to that framework, the plaintiff first must establish a prima facie case of retaliation. *Id*. The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason

for the adverse action. *Id*. Assuming the employer's burden is met, "the burden shifts back to the plaintiff to establish that the reason offered by the [employer] was not the real basis for the decision, but a pretext" for retaliation. *Id*.

To establish a prima facie case for retaliation under Title VII or section 1981, a plaintiff must show that he engaged in statutorily protected activity and that he suffered a materially adverse employment act that was causally related to the protected activity. *Chapter 7 Tr. v. Gate Gourmet, Inc*., 683 F.3d 1249, 1258 (11th Cir. 2012); see also *Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1268 (11th Cir. 2021). It is undisputed that Plaintiff suffered materially adverse employment action when she her assignment was ended abruptly on January 24, 2023. Hence, we can dispense with the inquiry as to the second prong of the legal analysis.

A. Plaintiff Engaged in Protected Activity

To satisfy the opposition clause the employee "must have a good faith, 'reasonable belief' that her employer engaged in unlawful discrimination." *Clover v. Total Sys. Servs., Inc.* 176 F.3d1346, 1351 (11th Cir. 1999). This means the plaintiff must show that she subjectively in good faith believed her employer engaged in unlawful discrimination and her belief was reasonably objective in light of the facts and record present. *Taylor v. Cardiovascular Specialist, P.C.* 4 F. Supp. 3d 1374,1378 (N.D. Ga. 2014) (quoting *Little v. United Techs., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997)).

The objective reasonableness of her belief is measured by reference to controlling substantive law. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). Even so, the plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). Title VII protects "individuals who explicitly or implicitly communicate a belief that the practice constitutes unlawful employment discrimination." *Id*. "In order to state a retaliation claim, the plaintiff need only show that he had a 'reasonable belief' that an unlawful employment practice was occurring, and is not required to show that the employer actually engaged in an unlawful employment practice." *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998). The conduct opposed need only "be close enough to support an objectively reasonable belief that it is." *Clover*, 176 F.3d 1346, 1351. "[W]hether [Plaintiff] reported employment discrimination is a question of fact that cannot be resolved at summary judgment." *Howard v. Sunniland Corp.*, 281 F. Supp. 3d 1253, 1259 (M.D. Fla. 2017).

a. Plaintiff Subjectively Believed She Was Opposing Unlawful Discrimination

On January 19, 2023, during a phone call with Ms. Buckovich, Plaintiff voiced concerns that she lacked the training and experience to safely perform PD (Doc. 24 at 109:19–25, 110:1–12; Doc. 25 at 8:4–14), and that the decision to assign her these duties was rooted in racial disparities in the workplace. In that call, Plaintiff told Ms.

Buckovich that Defendant served a predominantly African American patient population and that requiring her to perform PD without adequate training was akin to treating these patients "as guinea pigs". (Exhibit 4 at ¶7). She further stated her belief that she was being placed in this position because she was an African American nurse, while similarly situated white nurses were not held to the same high standard. (Doc. 1 ¶¶ 12–13) (Exhibit 4 at ¶10). These statements explicitly tied her objection to race, both her own and that of the patients, and reflected her good-faith belief that Defendant's conduct was discriminatory. Plaintiff's testimony and contemporaneous communications confirm she made these objections sincerely and with the intent to oppose what she perceived as unlawful discrimination.

b.  <u>Plaintiff's Belief Was Objectively Reasonable in Light of the Facts</u>

Further, Plaintiff's belief was objectively reasonable based on the facts known to her on January 19, 2023. She understood from her prior work experience that most nurses assigned to night shifts and high-burden units at Emory were African American. (Doc. 24 at 82:9–11). In her prior assignments, white nurses had not been uniformly required to perform PD, and during her time at Emory Midtown, travelers, many of whom were Black, were prohibited from performing PD. (*Id.* at 42:1–2).

As she explained to Ms. Buckovich during the January 19 call, Plaintiff was aware from professional standards that PD competency typically required substantially more training than the four hours she was being offered. (*Id.* at 109:19–

25). Direct Emory employees, by contrast, received four to six weeks of PD training. (*Id.* at 110:18–21). The abrupt imposition of these duties on her, without comparable expectations for white nurses and without adequate preparation, supported a reasonable belief that she was being subjected to race-based disparate treatment affecting both her and the predominantly African American patients she would serve.

c. Defendant's "Workplace Safety" Argument Mischaracterizes the Complaint

Defendant argues that Plaintiff's complaint is not protected activity because it referenced workplace safety, and that safety concerns alone, without reference to a protected class, would not be covered under Title VII or § 1981. While it is correct that a generic workplace safety complaint is not protected under these statutes, Plaintiff's January 19, 2023 complaint was not generic. Her objection to inadequate PD training was expressly linked to the race of the patients being served and her own race as an African American nurse. (Exhibit 4 at ¶7). She tied the safety concern to systemic disparities in treatment, both in the allocation of job duties to African American nurses and in the quality of care provided to a predominantly African American patient population. (Exhibit 4 at ¶10). Thus, the safety element of her complaint was inseparable from her allegation of race-based disparate treatment. The fact that her concern was framed in terms of both safety and race strengthens, rather than weakens, its status as protected activity.

10

Therefore, the record clearly demonstrates that Plaintiff not only subjectively believed she was opposing unlawful race discrimination when she raised her objections in January 2023, but that her belief was objectively reasonable based on her professional experience, prior treatment at Defendant, the racial composition of the workforce and patient population, and the disparate training expectations imposed on her. (Exhibit 4 at ¶7-10). These facts create a genuine dispute as to whether her January 2023 complaints constituted protected activity under Title VII and § 1981, precluding summary judgment on this element of her retaliation claims.

> B. <u>Causal Connection Exists between Plaintiff's Protected Activity and Adverse Employment Action</u>

Plaintiff can establish a causal connection between her January 19, 2023 protected activity and the termination of her contract on January 24, 2023 through undisputed evidence of Defendant's knowledge of her complaint and the extremely close temporal proximity between the two events. To establish causation, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Clover*, 176 F.3d 1346, 1354. "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Evidence of the employer's awareness, coupled with a close temporal proximity between the employee's protected conduct and the adverse employment action, is sufficient circumstantial evidence to create a genuine issue of

material fact on a causal connection. *Brungart v. Bellsouth Telecommunications*, 231 F.3d 799 (11th Cir. 2000). The Eleventh Circuit reasoned "[a]n eight-day period is very close." *Mihoubi v. Caribou Coffee Co*., 288 Fed. Appx. 551, 551 (11th Cir., 2008). Intervening acts or misconduct can sever the causal connection between a protected act and an adverse action. *Ramos v. Delphi Behav. Health Grp., LLC*, No. 21-11218, 2022 U.S. App. LEXIS 12021, *10 (11th Cir. 2022).

Here, Defendant was directly aware of Plaintiff's protected activity. On January 19, 2023, during a telephone conversation, Plaintiff raised concerns to Ms. Buckovich that the requirement to perform PD without proper training would place both her and the predominantly African American patients at risk, and that the assignment reflected disparate treatment of African American nurses compared to similarly situated white nurses. (Exhibit 4 at ¶7-10). This conversation was explicit in connecting her safety concern to racial discrimination. At the conclusion of that call, Ms. Buckovich did not indicate that Plaintiff was ineligible for the assignment or that her qualifications were in dispute (Doc. 25 at 12:16–18). To the contrary, Ms. Buckovich offered Plaintiff a 12-hour orientation on January 25, 2023, and confirmed her revised schedule (RPD, Exhibit 6, at p. D000104). AMN also confirmed on January 20, 2023 through email that Plaintiff would start her scheduled shift on January 25, 2023 (*Id.* at p. D000109).

Defendant argues that the decision to end Plaintiff's contract was based on an intervening event — that she was not qualified to perform PD. This reliance on the "intervening event" reasoning is misplaced and distinguishable from the case it cites. In *Fleming*, the plaintiff failed a state-mandated typing test, which was an absolute prerequisite for employment, leaving the employer no choice but to reject her. *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997).

Here, no such disqualifying event occurred. Defendant knew of Plaintiff's lack of PD training before January 19 and had already offered her training, which was accepted by Plaintiff as well. (Doc. 25 at 8:4–14; Doc. 24 at 121:16–20, 122:6–8). Plaintiff agreed to the training offered, did not refuse to perform PD duties, and did not decline orientation. (Doc. 24 at 9:2-5, 121:16-20; Doc. 25 at 12:16–18, 14:12–14). There was no change in her qualifications or willingness to perform duties between the January 19 conversation and the January 23 termination.

There is no material event occurring between January 19 and January 24. The termination just five days later is even closer than the what the Eleventh Circuit found "very close" in *Mihoubi*. Additionally, Defendant's prior knowledge of Plaintiff's training status and willingness to proceed with her onboarding, supports a strong inference of causation. Defendant's own actions on January 20, offering training, confirming a start date, and finalizing her schedule, demonstrate that it considered Plaintiff qualified and prepared to begin work. No legitimate intervening

event occurred between her January 19 protected complaint and her January 24 termination. The close temporal proximity of five days, combined with Defendant's awareness of her protected complaint, creates a genuine issue of material fact as to the causal connection element of her retaliation claims.

## 2. <u>Plaintiff is Entitled to Summary Judgment on her Retaliation claim based on the "Convincing Mosaic" Standard</u>

Aside from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019); *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2023).

Here, the record, when viewed in the light most favorable to Plaintiff, contains a convincing mosaic of circumstantial evidence from which a reasonable jury could infer retaliatory intent. First, there is a clear pattern of suspicious timing following

Plaintiff's protected complaints. In September 2022, while on assignment at Emory University Hospital Midtown, Plaintiff made a formal complaint of racial discrimination against Ms. Lake. (Doc. 24 at 57:20; 58:20-21; 131:9-11). Within hours of making that complaint, her contract for that assignment was terminated. (*Id.* at 58:20-21; 78:11–12).

This pattern was repeated in January 2023. Just five days after Plaintiff again raised concerns to Ms. Buckovich that Defendant was engaging in racially disparate treatment by assigning her, an African American nurse, to perform PD without adequate training while not holding white nurses to the same standard, her contract was terminated before she began her first shift (Doc. 1 ¶¶ 18–19) (Exhibit 4 at ¶10)). This occurred despite her agreement to proceed with the assignment and participate in the offered training (Doc. 25 at 12:16–18; Doc. 24 at 121:16–20, 122:6–8).

Second, the record reflects systemic racial dynamics within Defendant's travel nurse assignments. Plaintiff observed, and testified, that most travel nurses at Emory were Black, particularly on night shifts and in high-burden units. (Doc. 24 at 82:9–11). She also knew that at Emory Midtown, travelers, many of whom were African American, were prohibited from performing PD (*Id.* at 42:1–2), yet she was suddenly required to do so without prior notice or full training. Permanent Emory nurses, by contrast, were provided four to six weeks of PD training before being assigned to perform the procedure (*Id.* at 110:18–21), while Plaintiff was offered

only a single 12-hour orientation with four hours of PD instruction (Doc. 25 at 8:4–14; Doc. 1 ¶ 15). This disparity reinforced Plaintiff's belief that she was being subjected to unequal and unsafe treatment because of her race and employment status.

Third, Plaintiff never refused the PD assignment or the training; she merely stated that if, after training, she did not feel competent to safely perform PD, she would inform her manager (Doc. 24 at 121:16–20, 122:6–8; Doc. 25 at 12:16–18; RPD, Exhibit 7, at p. D000121). Ms. Buckovich initially agreed to this approach, confirming in deposition that Plaintiff never declined training and in fact wanted to move forward with the contract. (Doc. 25 at 14:12–14). The decision to terminate came only due to Plaintiff's safety concerns tied to racial disparities in staffing and patient care.

Finally, Plaintiff raised her January 19 complaint explicitly linking workplace safety to the race of patients and nurses. (Exhibit 4 at ¶¶7-10). Four days later, Defendant ended her contract (Doc. 1 ¶ 19), despite having confirmed her start date (RPD, Exhibit 8, at p. D000104) and offered her the PD training she requested (Doc. 1 ¶ 15; RPD, Exhibit 8, at p. D000104). The absence of any genuine intervening event between these two dates strongly supports an inference that the termination was motivated by retaliatory animus.

Taken together, the repeated immediate terminations after racial complaints, the systemic staffing patterns disadvantaging Black travel nurses, the suspicious timing, and the shifting rationale, forms a compelling mosaic from which a jury could conclude that Plaintiff's protected activity was the but-for cause of her termination.

**IV.**   **Defendant's Proffered Legitimate, Nondiscriminatory Reasons are Pretextual**

If the plaintiff meets the pleading requirements, the burden shifts to the defendant to identify a legitimate, non-discriminatory reason for the adverse employment action. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir, 2000). If the defendant proffers such a legitimate purpose, the burden shifts back to the plaintiff to ultimately prove that the defendant's stated reason was a pretext for unlawful discrimination. *Id.* "[C]lose temporal proximity ... is evidence of pretext, though probably insufficient to establish pretext by itself" *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *Kingsley v. Tellworks Communs., LLC*, No. 1:15-CV-4419-TWT-JSA, 2017 U.S. Dist. LEXIS 92619, *75 (N.D. Ga. 2017). In order to prove pretext, the plaintiff may offer "direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of

comparative or statistical evidence." *Woody v. St. Clair County Comm'n*, 885 F.2d 1557, 1560 (11th Cir. 1989). Pretext may be proven when the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Thomas v. Dolgencorp, LLC*, 645 Fed. Appx. 948, 950 (11th Cir. 2016); *Sheridan*, 100 F.3d at 1072 (quoting *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir.1997). In *Munoz v. Oceanside Resorts, Inc*., 223 F.3d 1340, 145 (11th Cir. 2000), the Court held that conflicting testimony between an employee and employer about a key incident can create a genuine issue of fact as to pretext and such credibility determinations are for the jury, not the court, to resolve.

Here, Defendant's stated reason for terminating Plaintiff's assignment, that she could not safely administer PD to patients, is unworthy of credence when viewed in light of Defendant's own actions, prior statements, and the undisputed sequence of events. First, Defendant's own position before January 23, 2023 contradicts its claimed basis for termination. Defendant knew prior to January 23 that Plaintiff had no prior experience performing PD. Rather than treat this as disqualifying, Defendant explicitly offered training to nurses who lacked PD experience and informed Plaintiff that a single 12-hour orientation would be "appropriate training" for the skill. (Doc. 25 at 8:4–14; Doc. 1 ¶¶ 15–17). Defendant further represented

that four hours of PD-specific training was sufficient for nurses to begin performing the procedure. (Doc. 25 at 8:4–14). Although Plaintiff expressed concerns that four hours was inadequate in light of medical literature (Doc. 24 at 109:19–25), she nevertheless agreed to proceed with the training offered by Defendant (Doc. 25 at 12:16–18; Doc. 24 at 9:2-5; 121:16–20, 122:6–8).

Second, the record confirms that Defendant accepted Plaintiff's agreement to proceed. On January 20, after Plaintiff agreed to the training, Ms. Buckovich finalized her schedule and confirmed her start date for January 25, 2023. (Doc. 1 ¶¶ 15–17; RPD, Exhibit 8, at p. D000104). AMN also confirmed Plaintiff's assignment that same day by stating, "She will be there next week[.]" (RPD, Exhibit 9, at p. D000109). At no point during this process did Defendant state that Plaintiff's lack of PD training rendered her unqualified or that she would not be permitted to begin work. (Doc. 25 at 14:12–14).

Third, Defendant's actions in this case reflect a pattern of retaliatory decision-making. On September 13, 2022, Plaintiff made a formal racial discrimination complaint against Ms. Lake, reporting that Ms. Lake exhibited racist tendencies, including disparate treatment of African American nurses. (Doc. 24 at 57:20, 58:21, 131:9–12, 21). Within hours, Defendant terminated her assignment at Emory University Hospital Midtown. (*Id.* at 58:20-21; 78:11–12). In January 2023, the same retaliatory pattern repeated. Just five days after Plaintiff complained to Ms.

Buckovich about racially disparate treatment and unsafe PD training (Exhibit 4 at ¶¶7-10), Defendant again terminated her contract. (Doc. 1 ¶ 19). This close timing, occurring twice within months, supports a reasonable inference of a retaliatory motive and pattern of adverse action.

Fourth, Defendant relies heavily on a January 20, 2023 message from Plaintiff stating: "Also just a reminder I have no peritoneal dialysis experience. I will attempt to learn the assignment." (Doc. 24-17). This message was not a refusal to perform PD. It explicitly affirms that Plaintiff would attempt to learn the assignment and only if she later felt unsafe, would she notify Defendant. (*Id.* at 122:6–8; Doc. 25 at 12:16–18, 14:12–14). Ms. Buckovich testified that this message caused her to decide to terminate Plaintiff (Doc. 25 at 14:4–11), yet she also asked later whether Plaintiff was coming to work (RPD, Exhibit 9, at p. D000110). If the decision had truly been made because of the message, there would have been no reason to confirm her attendance or continue with training plans. Moreover, the same concerns expressed in the message had already been discussed during the January 19 call, which ended with an agreement to provide training and proceed with the assignment. (Exhibit 4 at ¶12). This undermines any claim that the message was a new intervening event.

Finally, Defendant points to Plaintiff's disclosure that she was being tested for COVID-19 and might be delayed in starting her scheduled shift. (Doc. 24 at 119:11–18). Plaintiff did not state she would be unable to start the assignment

altogether; she merely indicated she might start later than planned, depending on her test result. This temporary scheduling uncertainty does not explain why Defendant abruptly terminated her assignment just four days after confirming it (Doc. 1 at ¶24; RPD, Exhibit 9, at p. D000109).

Taken together, the pattern of immediate terminations following protected complaints, the close proximity of only four days between Plaintiff's January 19 complaint and January 23 termination, and the inconsistencies in Defendant's handling of the January 20 message, demonstrate that Defendant's stated reason is not credible. Offering and confirming training, declaring it sufficient, finalizing Plaintiff's schedule, and acknowledging her willingness to perform PD all contradict the claim of disqualification. A reasonable factfinder could conclude that retaliation for Plaintiff's January 19 race discrimination complaint, not a sudden change in her qualifications, was the true motive.

## V.    <u>Conclusion</u>

Because Plaintiff has satisfied the elements of his prima facie case and because Defendant has failed to articulate a legitimate, non-discriminatory reason for Plaintiff's retaliatory action, summary judgment must be denied.


Respectfully submitted, this 29th day of August 2025.

/s/ *Jesse L. Kelly*
Jesse L. Kelly
Georgia Bar No. 935869
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the forgoing has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1(C), and that I served the within and foregoing PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT on all counsel of record by filing it with the Court's electronic filing and service system (CM/ECF), which will automatically send e-mail notices of such filing to all attorneys of record.

This 29th day of August 2025.

*/s/ Jesse L. Kelly*
Jesse L. Kelly
Ga Bar No. 935869
jesse@jkellypc.com

JESSE KELLY PC
3355 Lenox Rd. Suite 1000
Atlanta, GA 30326
Telephone:(678) 460-6801
Facsimile :(678) 730-3443
Email:        jesse@jkellypc.com